UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___3/26/2026___

JAMES S. BENEDICT et al.,

      Plaintiffs,

   -against-

ROBERT MANFRED et al.,

      Defendants.

24-CV-04314 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs in this case are 35 former Major League Baseball scouts between the ages of 54 and 86. Between 2020 and 2023, each Plaintiff unsuccessfully sought employment from one or more Major League Baseball clubs (the "Clubs" or the "Club Defendants"). Plaintiffs allege that the Clubs, acting as joint employers with Commissioner of Baseball Robert Manfred and the Office of the Commissioner of Baseball d/b/a Major League Baseball ("MLB" and together the "MLB Defendants"), violated the Age Discrimination in Employment Act ("ADEA") by denying employment to them and others similarly situated. All Defendants move to dismiss Plaintiffs' Fifth Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6); the Clubs located outside of New York also seek to dismiss for lack of personal jurisdiction under Rule 12(b)(2); and the New York Mets also seek to dismiss for lack of venue. For the reasons set forth below, Defendants' motion is GRANTED.

1

## BACKGROUND

### I.    RELEVANT FACTS[1]

#### A.  Individual Hiring-Related Allegations

Between 2019 and 2022 each Plaintiff was terminated from the Club for which he worked as a scout.  Compl. ¶ 2–36.  Each Plaintiff has since reached out to one or more Clubs seeking employment, but no Plaintiff has been rehired by any Club.  *Id.* ¶ 111.  Additionally, Plaintiffs provide six specific examples of instances in which a Plaintiff scout was not hired for purportedly discriminatory reasons.  First, in August 2020, an employee of the New York Yankees informed Plaintiff Jeffrey N. Scholzen that the club did not have sufficient funds to hire scouts.  *Id.* ¶ 104.  Second, in August 2020, the Vice President of Professional Scouting for the San Francisco Giants informed Mr. Scholzen the club had current scouts who were "ready to retire" and it was unclear whether he would be allowed to replace them with new hires.  *Id.* ¶ 105.  Third, following an interview with the Amateur Scouting Director of the Chicago White Sox that took place between 2020 and 2023, Plaintiff Steven Pope was informed that the White Sox were unable to hire another "veteran scout."  *Id.* ¶ 106.  Fourth, in late 2022, Plaintiff Rick L. Ragazzo interviewed for a scouting position with the Colorado Rockies.  He was asked directly about his age during the interview and was subsequently not hired.  *Id.* ¶ 107.  Fifth, Mr. Ragazzo was also contacted by the pro scouting director of the Boston Red Sox who asked about his interest in a part-time scouting position.  *Id.* ¶ 108.  According to Plaintiffs, the Red Sox "refused to hire Ragazzo and instead utilized Ragazzo's knowledge, qualifications, training, and experience in seeking recommendations" to ultimately hire two scouts who are "substantially

---

[1] The following facts are taken from the allegations in the Fifth Amended Complaint ("Compl."), Dkt. No. 94, and are assumed true for the purpose of resolving this motion.

younger" than him. *Id.* Sixth, in October 2021, the Scouting Director of the Chicago White Sox interviewed Plaintiff Dennis M. Sheehan for a scouting position but instead hired a 25-year-old without scouting experience. *Id.* ¶ 110.

**B. General or Systemic Allegations**

Plaintiffs also raise a number of general or systemic allegations that are not expressly related to each Plaintiff's individual age discrimination claim. Those allegations are summarized below.

**1.      The Role of a Baseball Scout in MLB**

A brief explanation of the role of a baseball scout is helpful in understanding the allegations against the MLB. A scout evaluates players' skills and creates reports presenting those evaluations. *Id.* ¶ 75. Scouts assess players ranging from the high school level to current major leaguers. *Id.* Traditionally, scouts assessed players by attending games in person, watching the subject player, and creating a report that rates the subject player on a scale of 20 to 80. *Id.* ¶¶ 75–76. The report is then provided to the baseball club (*i.e.*, team) that the scout works for to assist the team in determining which players to pursue. *Id.*

Each scout is employed by an individual Club or, in the past, by MLB's Central Scouting Bureau. *Id.* ¶¶ 87, 94. Clubs typically advertise available scout positions through informal networking and outreach. *Id.* ¶ 86. A scout usually works for a particular Club until the Club terminates the scout. *Id.* ¶ 87. Prior to 2015, the Clubs collectively maintained a "wire" on which they placed the names of non-renewed or terminated scouts when they were no longer employed by a particular Club, so that other Clubs would know those scouts were available. *Id.* ¶ 89.

### 2.    MLB's Changes in Scouting and Hiring Practices

Around 2015 when Defendant Manfred became Commissioner, he accelerated the shift towards a more statistically-oriented approach in baseball, often referred to as "moneyball," which, in the context of scouting, meant a greater focus on numerical analytics and review of video of subject players. *Id.* ¶ 74. Plaintiffs allege that, in connection with this changed approach, MLB and the Clubs began heavily recruiting Younger Scouts (defined as under 40) and intentionally "pushing out" Older Scouts (defined as over 40). *Id.* ¶¶ 1,74. Additionally, in 2020, the Clubs did not renew or otherwise terminated the contracts of 51 of the 83 Older Scouts then-employed by Clubs. *Id.* ¶ 100. The Clubs informed the terminated individuals that their terminations were due to the ongoing COVID pandemic. *Id.* Plaintiffs claim that "even since the pandemic was over and MLB revenues returned, Older Scouts are being systematically denied reemployment, including through the use of a list or lists and an agreement, pattern, practice, and effective rule to maintain lower numbers of Older Scouts throughout MLB." *Id.*

Additionally, MLB previously had a "Central Scouting Bureau" in which MLB itself employed scouts. *Id.* ¶ 94. In March 2018, MLB terminated five of the remaining seven scouts at the scouting bureau, whose ages ranged from 44 to 67. *Id.* The two scouts who were not terminated were ages 43 and 40. *Id.* Plaintiffs describe these events as "'writing on the wall' for Older Scouts still employed by Clubs." *Id.* They also allege that the termination was pursuant to an "an official directive from [the Commissioner] to fire all remaining Older Scouts within the MLB Scouting Bureau." *Id.* MLB no longer has a centralized scouting bureau. *Id.*

### 3.    MLB's Alleged Coordination with Clubs

Like players and coaches, MLB requires scouts to enter into a uniform employment contract that the commission approves. *Id.* ¶ 83. MLB also has rules that expressly prohibit any Club "tampering" with a contract between another Club and its "players, coaches, managers, and

4

umpires;" this anti-tampering rule requires a Club to obtain written authorization from the current employing Club if it seeks to contact one of those individuals for employment. *Id.* ¶¶ 81–82. Plaintiffs allege that Defendants have coordinated to *de facto* apply these requirements to scouts, thus prohibiting Clubs from communicating about job opportunities with a scout while the scout is under contract with a different Club. *Id.* ¶ 84. In addition, between 2020 and 2022, Defendants instituted an "offset" policy in which, if a scout was terminated by a Club and then hired by another Club, any remaining compensation due from the terminating Club would be offset by the payments from the new Club. *Id.* ¶ 88. According to Plaintiffs, this practice operated "to the detriment of Older Scouts." *Id.*

### 4. "Blacklist" of Older Scouts

Based on statements made to individual Plaintiffs, one or more Clubs possessed a list identifying "Senior Scouts" (apparently different from "Older Scouts," but in an undefined way), and this list was "used to refuse to rehire such Scouts." *Id.* ¶ 96. Similarly, Plaintiffs allege that "directives by the Commissioner's office" were "frustrating or otherwise preventing the rehiring of such Scouts." *Id.* Plaintiffs also allege that there is a list or lists of "Older Scouts who cannot be hired back into professional baseball because, among other things, of their age." *Id.* It is not clear if this list is the same as the Senior Scout list or is a different but overlapping list. Plaintiffs who have contacted employees of Clubs seeking employment as scouts have been informed that they were restricted from applying for new scouting jobs upon non-renewal or other termination of their employment based on one or more of such lists. *Id.* As a specific example, the director of Latin American scouting for the Atlanta Braves informed Plaintiff Gordon Blakeley that a list exists, and that Mr. Blakeley was on this list of "non-hirable Scouts." *Id.*

### C. Plaintiffs' ADEA Claim

Plaintiffs bring a single cause of action against all Defendants for violation of the ADEA. They allege that all Defendants "in systematically refusing to consider Older Scouts for reemployment in other Club Scout positions for which they are qualified, have engaged in age discrimination in violation of the ADEA." *Id.* ¶ 116.

## II.    PROCEDURAL HISTORY

This case was initially filed on June 21, 2023 in the United States District Court for the District of Colorado. Dkt. No. 1. On May 20, 2024, in lieu of deciding the motions to dismiss, the Colorado District Court transferred the case to this District for improper venue pursuant to 28 U.S.C. § 1404(a). Dkt. No. 71. On August 20, 2024, Plaintiffs filed a Fifth Amended Complaint, Dkt. No. 94, which Defendants moved to dismiss, Dkt. No. 100. The motions are now fully briefed and before the Court for decision.[2]

**DISCUSSION**

## I.    LEGAL STANDARD ON A MOTION TO DISMISS

### A. Rule 12(b)(2)

To defeat a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that personal jurisdiction exists. *Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple*, 92 F.4th 450, 455–56 (2d Cir. 2024).[3] "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if

---

[2] For purposes of this Opinion, the Court refers to Defendant's brief in support of their motion to dismiss, Dkt. No. 101, as "Mot."; Plaintiffs' opposition brief, Dkt. No. 104, as "Opp."; and Defendants' reply brief, Dkt. No. 105, as "Rep."

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

credited, would suffice to establish jurisdiction over the defendant." *Id.* Plaintiffs must make jurisdictional allegations with "factual specificity"—they "cannot establish jurisdiction through conclusory assertions alone." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 395 (S.D.N.Y. 2021). Additionally, "[w]hen personal jurisdiction is predicated on specific jurisdiction, a plaintiff must establish a prima facie case of jurisdiction as to each claim." *Id.* at 396.

The showing a plaintiff must make to "defeat a jurisdiction-testing motion varies depending on the procedural posture of the litigation." *Mao v. Sands Bethworks Gaming LLC*, No. 15-CV-6252 (JMF), 2016 WL 1717220, at *2 (S.D.N.Y. Apr. 28, 2016). Where, as here, discovery has not been conducted "a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.*

### B.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. The Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by

the moving party."). However, the Court need not accept conclusory assertions. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).

On a Rule 12(b)(6) motion, a court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). That universe includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

## II. PLAINTIFFS' JOINT EMPLOYER, CONSPIRACY, AND COLLECTIVE ACTION ALLEGATIONS FAIL TO ESTABLISH PERSONAL JURISDICTION OVER THE NON-RESIDENT DEFENDANTS

Plaintiffs seek to establish personal jurisdiction over the 28 Clubs that do not reside in New York (the "Non-Resident Defendants"),[4] based on the presence of the MLB Defendants in Manhattan and on their allegations that all Defendants were joint employers, co-conspirators, or engaged in "collective action." Compl. ¶ 69(c). None of these provides a sufficient basis to confer jurisdiction over the Non-Resident Defendants.

### A. Plaintiffs Have Not Established "Joint Employer" Jurisdiction

First, Plaintiffs cannot establish jurisdiction pursuant to a joint employer theory because they have not sufficiently alleged that the MLB Defendants that are domiciled in New York served as their joint employers with any particular Non-Resident Defendant that might have hired them.[5] Courts in this district have found that adequately alleging a joint employment relationship is "sufficient to render defendants amenable to jurisdiction in New York." *Xiaoyan*

---

[4] The parties do not dispute the Court's personal jurisdiction over the Defendants that are domiciled in New York. These Defendants are the MLB Defendants, New York Yankees Partnership (the "New York Yankees" or "Yankees") and Sterling Mets, L.P (the "New York Mets" or "Mets").

[5] Because Plaintiffs claims are based on a failure-to-hire theory, the Court interprets Plaintiffs' joint employer allegations to refer to Plaintiffs' future employer had they been hired by any clubs.

*Liu v. Canteen 82 Inc.*, No. 17-CV-07862 (KPF), 2018 WL 6067228, at \*5 (S.D.N.Y. Nov. 20, 2018); *but see Henao v. Parts Auth., LLC*, 557 F. Supp. 3d 490, 496 (S.D.N.Y. 2021) ("The cases holding that the single integrated enterprise theory is one of liability and not jurisdiction are persuasive."). Plaintiffs cannot make this showing.

A joint employer relationship exists "when two or more entities, according to common law principles, share significant control of the same employee." *Felder v. United States Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022). In the employment discrimination context, factors relevant to analyzing whether a joint employment relationship exists include whether "an entity other than the employee's formal employer has power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities, such that we may properly conclude that a constructive employer-employee relationship exists." *Id.* at 844. The relevant factors "may vary depending on the case" but the "guiding indicator" remains "control." *Id.* The basis for Plaintiffs' joint employer argument is that the Commissioner of MLB has overall control over MLB labor relations. Opp. at 27. But nowhere do Plaintiffs allege that the control extends to employer decisions concerning any individual Plaintiff. At most, Plaintiffs argue that MLB and the Commissioner exercise control, league-wide, through mandating the use of standardized universal employment contracts, requiring mandatory arbitration, and taking various measures to limit the number of scouts over 40 employed by Clubs. *Id.* at 5, 28. These allegations are insufficient to establish the "immediate control" over an employee that a joint employment relationship requires. *Bueno v. Eurostars Hotel Co., S.L.*, No. 21-CV-535 (JGK), 2022 WL 95026, at \*6 (S.D.N.Y. Jan. 10, 2022). Furthermore, Plaintiffs do not allege any of the other factors relevant to assessing a joint employer relationship: Plaintiffs do not allege that, had

9

they been hired, the MLB Defendants would have paid their salary or controlled their daily tasks.[6]

### B. Plaintiffs' Conspiracy Allegations Do Not Establish Jurisdiction

Plaintiffs also fail to establish personal jurisdiction over the Non-Resident Defendants through their conspiracy allegations. Plaintiffs allege that Defendants engaged in a conspiracy to limit the number of scouts over the age of 40, "including refusals to hire Older Scouts, limiting the number of Older Scouts employed by each Club and blacklisting Older Scouts." Opp. at 2. As an initial matter, any exercise of personal jurisdiction must comport with New York's long-arm statute. *Oklahoma Firefighters Pension & Ret. Sys.*, 92 F.4th at 456. Plaintiffs state that Section 302(a)(1) is the only section of New York's long-arm statute that applies to their claims. *See* Opp. at 21. But "numerous district courts sitting in New York have held that Section 302(a)(1) of New York's long-arm statute does not provide for co-conspirator jurisdiction." *Lively v. Wayfarer Studios LLC*, No. 24-CV-10049, 2025 WL 1952027, at *15 (S.D.N.Y. July 16, 2025). Even if Section 302(a)(1) did allow for co-conspirator jurisdiction, Plaintiffs still have not sufficiently alleged it.

To allege personal jurisdiction under a conspiracy theory "the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018). Plaintiffs have satisfied the first two elements by alleging

---

[6] Plaintiffs allege that the MLB Defendants were ultimately responsible for various failure-to-hire decisions because of the purported "blacklist" or other policies that Plaintiffs believe discouraged individual Clubs from hiring scouts over 40. But, as discussed elsewhere, these allegations are too speculative, and too unconnected to any individual failure-to-hire situation alleged, to support personal jurisdiction on a joint employer theory. *See Felder*, 27 F.4th at 843.

that Defendants participated in a conspiracy to limit the number of Older Scouts employed by MLB clubs and that the Non-Resident Defendants participated in the conspiracy by refusing to hire older scouts.  However, Plaintiffs cannot satisfy the third element because they have not sufficiently alleged overt acts with sufficient contacts in New York in furtherance of this alleged conspiracy.

The only overt acts alleged to have taken place in New York are (1) a member of Yankees management informing one of the Plaintiffs in August 2020 that they did not have enough money to hire additional scouts, and (2) MLB's purported creation of a blacklist of older or "senior" scouts.  Compl. ¶¶ 69, 104.  It is not plausible that the statement by the Yankees that they did not have sufficient funds to hire scouts was made in furtherance of the alleged conspiracy to limit the number of Older Scouts hired because the statement is unrelated to age. While Plaintiffs assert that the statement must have been a pretext to justify not hiring the Older Scout in question because the Yankees are one of the most profitable franchises in professional sports, that requires a leap of logic that the Court cannot endorse.  Even very profitable companies can choose to allocate their funds to whatever activities they choose, and deciding not to expend funds on salaries for additional scouts does not equate to age discrimination. Additionally, "[f]or the exercise of personal jurisdiction to comport with due process . . . conspiracy-related conduct must be such that [the foreign defendants] should reasonably anticipate being haled into court in New York." *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 294–95 (S.D.N.Y. 2019).  The statement was not made by any Non-Resident Defendant and there is no indication in the Complaint that any Non-Resident Defendant was involved in or even aware of the statement.  Thus it would be unreasonable for them to expect to be subject to

jurisdiction in New York based on a statement by an employee of a competitor, of which they were not aware and that facially does not appear to be related to the alleged conspiracy.

The allegations related to the creation of a blacklist of older scouts are also not sufficient to establish an overt act that would allow for conspiracy jurisdiction because Plaintiffs do not sufficiently allege that the blacklist was created in New York or, more importantly, that any of the Non-Resident Defendants were involved in its creation or dissemination. Plaintiffs claim that there was "a list or lists of Senior Scouts formerly associated with one or more Clubs provided to one or more of the Clubs being used to refuse to rehire such Scouts, or directives by the Commissioner's office to one or more such Clubs frustrating or otherwise preventing the rehiring of such Scouts, or both." Compl. ¶ 96. Plaintiffs also include the creation of a blacklist as among a set of acts, "all or almost [all of] which occurred in or were centered in the MLB Defendants' Manhattan principal place of business." Compl. ¶ 69. These allegations claim that there may have been one or more lists of Older Scouts and that these lists may have been created in New York by the MLB Defendants. Because these allegations do not definitively plead an overt act that took place in New York, and do not allege at all that any Non-Resident Defendant was involved in creating or disseminating such a list such that they could reasonably expect to be subject to personal jurisdiction in New York, they are not sufficient to confer jurisdiction through a conspiracy theory, even if New York's long-arm statute allowed for co-conspirator jurisdiction.

### C. "Collective Action" Allegations Cannot Confer Jurisdiction

Finally, to the extent Plaintiffs seek to rely on their "collective action" allegations, Opp. at 8, such allegations are insufficient to establish jurisdiction because courts look "only to the claims of *named* plaintiffs in assessing personal jurisdiction," *World Ass'n of Icehockey Players Unions N. Am. Div*, No. 24-CV-01066 (MMG), 2024 WL 4893266, at *10 (S.D.N.Y. Nov. 26,

2024). As discussed above, and further below, Plaintiffs have not alleged that any of the named Plaintiffs can establish jurisdiction in New York over any Non-Resident Defendant.

## III.  PLAINTIFFS CANNOT ESTABLISH JURISDICTION UNDER NEW YORK'S LONG ARM STATUTE FOR THE NON-RESIDENT DEFENDANTS

Defendants also argue that the Court lacks specific jurisdiction over the Non-Resident Defendants, individually, under New York's long-arm statute. Mot. at 7. To assess specific jurisdiction, courts conduct a two-step analysis.[7] "First, the court applies the forum's long-arm statute. Second, if the long-arm statute permits the exercise of jurisdiction, the court determines whether that exercise would comport with the Due Process Clause." *Oklahoma Firefighters Pension & Ret. Sys.*, 92 F.4th at 456. Within this second step, courts also evaluate "minimum contacts and reasonableness." *Id.*

In New York, N.Y. C.P.L.R. § 302 governs "the question of long-arm personal jurisdiction over an out-of-state defendant." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010). Plaintiffs allege that this statute confers jurisdiction over the Non-Resident Defendants under Section 302(a)(1). Opp. at 21. Section 302(a)(1) confers jurisdiction over a non-domiciliary that "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). When evaluating specific jurisdiction under Section 302(a)(1), courts "look to both the language of the statute and the relation between the alleged conduct and the cause of action." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). Specifically, "[t]o determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction."

---

[7] Plaintiffs do not allege that the Court has general jurisdiction over the Non-Resident Defendants. Opp. at 11

*Id.* This section casts a "jurisdictional net" to reach "those defendants who, under the totality of circumstances, purposefully avail themselves of the privilege of conducting activities within New York, thus invoking the benefits and protections of its law." *Sullivan v. Walker Constr., Inc.*, No. 18-CV-09870 (AJN), 2019 WL 2008882, at *2 (S.D.N.Y. May 7, 2019).

### A. The Non-Resident Defendants Transact Business in New York

The Non-Residents Defendants satisfy the first prong of the section 302(a)(1) analysis because they transact business in New York by playing professional baseball games there. Plaintiffs allege that 14 of the 28 Non-Resident Defendants are members of the National League, which means that they play at least three games per year against the New York Mets at the Mets' home field in Queens, New York. Compl. ¶ 69. The remaining 14 Non-Resident Defendants are members of the American League and thus play at least three games annually against the New York Yankees at their home stadium in the Bronx, New York. *Id.* Additionally, pursuant to MLB's revenue sharing scheme, the Non-Resident Defendants share revenue with the New York Mets and Yankees. *Id.* The Court agrees with the analysis of other federal courts, including in this Circuit, that have found that the "unique nature of the business of professional [sports] clubs" requires non-resident clubs to transact business in other states by playing professional sports games there. *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 709, 715 (E.D.N.Y. 1972). For a professional sports team to make a profit, it must "systematically play games with other member teams . . . From this revenue-producing business, of necessity [the teams] enter into contracts for transportation, board, lodging and miscellaneous items with persons in those cities." *Id.*[8] In other words, the Non-Resident Defendants' business model is

---

[8] *See also id.* at 714–715 (holding that a non-resident basketball club conducted business in New where the club had "(1) regular and continuous, albeit periodic, visits to New York for the business purpose of playing professional games for profit with the New York member club pursuant to an obligatory seasonal schedule; (2) regular and continuous visits of defendant's officials and employees to

predicated on playing games in New York, which necessarily requires transacting business there in the form of both playing the game itself for profit and also contracting for hotel rooms, transportation, and other necessities.[9]

Furthermore, the baseball games that the Non-Resident Defendants play in New York are not the type of "sporadic" events discussed in the cases Defendants cite in opposition. *See* Mot. at 10. Of the two cases that Defendants cite in support of their argument that the Non-Residents clubs do not transact business in New York, one concerned a technology company that hosted "three sporadic events in the jurisdiction," *see Dareltech, LLC v. Xiaomi Inc.*, No. 18-CV-08729 (AKH), 2019 WL 3287957, at *8 (S.D.N.Y. July 22, 2019), and the other involved a college that held "limited student recruiting and alumni activities in New York," *Sullivan v. Ringling Coll. of Art & Design, Inc.*, No. 19-CV-1302 (RA), 2019 WL 6529823, at *4 (S.D.N.Y. Dec. 4, 2019). These cases present different circumstances from the regularly scheduled multi-annual intra-league games that the Non-Resident Defendants are required to play as part of their participation in the league and that are necessary to obtain a profit.

---

New York and dealings with New York business concerns—hotels, transportation companies, etc.—in furtherance of the execution of the business purpose in New York; and (3) participation in the management and revenues of the joint business enterprise . . . headquartered in New York.").

[9] The Court does not agree with Plaintiffs, however, that the Non-Resident clubs' scouting activities alone would be sufficient to satisfy the transacting business prong of Section 302(a)(1). This Court addressed a similar claim in *World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League.* No. 24-CV-01066 (MMG), 2024 WL 4893266 (S.D.N.Y. Nov. 26, 2024). There, like here, Plaintiffs had not "shown any substantial or continuing scouting and recruiting activities in New York" and had not "made any specific factual averment that any scouting activities . . . actually involved contact with players, as opposed to merely involving *observing* players and gathering information about which players to recruit." *Id.* at *13. The Court found these allegations insufficient to satisfy the transacting business prong of Section 302(a)(1) and that analysis applies with equal force here too.

## B. Plaintiffs' ADEA Claim Does Not Arise from the Non-Resident Defendants' Transaction of Business in New York

To satisfy Section 302(a)(1), Plaintiffs' ADEA claim must also "arise from" Defendants' transaction of business in New York. "New York courts have held that a claim arises from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." *Best Van Lines, Inc.*, 490 F.3d at 249.

Plaintiffs offer no factual allegations that satisfy this requirement. The allegations that form Plaintiffs' ADEA claim against the Non-Resident Defendants consist of (1) statements made by scouting personnel during interviews or other conversations with individual Plaintiffs, and (2) allegations that Plaintiffs sought to be hired (but were not) by the Non-Resident Defendants. *See* Compl. ¶¶ 105–111. Plaintiffs do not allege that the interviews or other employment conversations with the Non-Resident Defendants took place in New York, or that decisions by individual Clubs to hire or not hire a particular scout were made in New York.[10] *Id.* Furthermore, the decision not to hire an individual scout is far too attenuated from the Non-Resident Defendants' transaction of business activities in New York by playing baseball games there for Plaintiffs' age discrimination claims to arise from those activities.[11] While it might be true in some general sense that the Clubs' scouting activities allow them to target their player recruitment, which then in turn improves their outcomes in the games they play in New York against the Mets or Yankees, allowing such a remote connection to the hiring practices for the

---

[10] The Plaintiffs' collective or systemic allegations are addressed above.

[11] As noted above, the Non-Resident Defendants' scouting practices in New York, if any, do not satisfy the transacting business prong of Section 302(a)(1). Therefore, although any scouting done in New York might be more closely related to Plaintiffs' claims, it alone cannot serve as a basis for jurisdiction pursuant to New York's long-arm statute.

16

people who would conduct those scouting activities to suffice for specific jurisdiction would swallow the articulable nexus/substantial relationship test whole. None of the cases cited by Plaintiffs suggest otherwise. Accordingly, Plaintiffs cannot establish this Court's personal jurisdiction over the Non-Resident Defendants.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM FOR AGE DISCRIMINATION AGAINST THE MLB DEFENDANTS, YANKEES, AND METS

The parties agree that the Court has personal jurisdiction over the MLB Defendants, Yankees, and Mets. *See* Mot. at 26, 29. Accordingly, the sole issue concerning these Defendants is whether Plaintiffs have plausibly alleged that they violated the ADEA. The ADEA renders it unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a prima facie case of age discrimination under the ADEA, a Plaintiff must show that "(1) he is within the protected age group, (2) he was qualified for the position, (3) he experienced adverse employment action, and (4) such action occurred under circumstances giving rise to an inference of discrimination." *McConkey v. Churchill Sch. & Ctr.*, No. 24-CV-06091 (LJL), 2025 WL 2062195, at *14 (S.D.N.Y. July 23, 2025). At the pleading stage, a complaint does not need to plead facts sufficient to establish a prima facie case of discrimination, *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002), but it still must "give fair notice of the basis of plaintiff's claims and the claims must be facially plausible," *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 390 (S.D.N.Y. 2011). Additionally, a Plaintiff pleading age discrimination under the ADEA must allege that "age was the 'but-for' cause of the employer's adverse action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).

Plaintiffs' age discrimination claims against the Yankees and Mets must be dismissed because Plaintiffs have not sufficiently alleged that age was the "but-for" cause of the Yankees

or Mets' failure to hire any individual Plaintiff.  Plaintiffs make two specific allegations against the Yankees.  First, they allege that in August 2020, an employee of the New York Yankees communicated to one of the Plaintiffs that "ownership did not have the money to hire Scouts." Compl. ¶ 104.  Second, they allege that the Yankees were "contacted by one or more Plaintiffs seeking employment" but "failed to hire any Plaintiffs." *Id.* ¶ 111.  Neither of these allegations even facially suggests that any of the Plaintiff's age was the but-for cause of the Yankees' decision not to hire them.  Although Plaintiffs argue that the overall profitability and high player payroll of the Yankees shows that any appeal to a lack of funds must be a pretext for discrimination, that statement is entirely conclusory.  There might be many reasons why even a very profitable business would choose to allocate funds to one purpose rather than another. Moreover, Plaintiffs themselves identify the economic shocks of the COVID pandemic in 2020 as a basis for reductions in non-player staff, although they also assert that such claims were a pre-text to specifically fire Older Scouts.  *Id.* ¶ 100.

As to the Mets, Plaintiffs' sole allegation is that, like the Yankees, the Mets were contacted by Plaintiffs seeking employment but did not hire them.  Again, this allegation fails to even suggest that age was the but-for cause of the Mets' decision not to hire any individual Plaintiff.  Plaintiffs' allegations are further undercut by the fact that they do not allege that the Yankees or Mets hired younger employees in their stead.  "Without allegations that these older employees were replaced with younger employees outside the protected class, the causal connection between their age and their removal becomes too attenuated." *McConkey*, 2025 WL

18

2062195, at *15.  Accordingly, Plaintiffs fail to allege an age discrimination claim against the Yankees or Mets.[12]

Finally, Plaintiffs fail to state an ADEA claim against the MLB Defendants.  Plaintiffs' sole argument as to why the MLB employers are liable under the ADEA is that they are joint employers with the Clubs.  *See* Opp. at 36.  For the reasons set forth in section II(A) above, Plaintiffs have failed to allege that the MLB Defendants are joint employers of any Plaintiff.  Plaintiffs do allege a handful of specific incidents that come closer to meeting the pleading standard for an ADEA claim.  *See, e.g.*, Compl. ¶¶ 107, 109.  However, even assuming these incidents state a claim under ADEA, and even assuming that there can be co-conspirator liability under the ADEA, the Complaint is devoid of any connection between any alleged action by the MLB Defendants and the specific incidents that come closest to alleging an ADEA violation.[13]

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED.  Plaintiffs requested leave to file an amended complaint.  Opp. at 38.  Plaintiffs have already amended their Complaint five times.  However, with the benefit of this Court's decision on their claims, if Plaintiffs now believe they can cure the defects in the complaint through amendment, they must make a motion for leave to amend and demonstrate clearly why the proposed amendment would not be futile, and why Defendants would not be prejudiced by granting leave to amend.

---

[12] The Mets also moved for dismissal on the grounds that venue in this District is improper.  The Court does not address that argument because the claims against the Mets are dismissed on other grounds.

[13] Those alleged actions are either too generalized (*e.g.* allegations that closing MLB's Central Scouting Bureau was a "signal" to Clubs to push out Older Scouts) or are entirely inconsistent with these incidents (*e.g.* if there was a do-not-hire "blacklist" of specific names, and Ragazzo was on the list, then why would the Colorado Rockies even interview him for an opening?).

Defendants will, of course, have an opportunity to oppose that motion.  If Plaintiffs wish to file such a motion, they must do so within thirty (30) days of the date of this Opinion.

The Clerk of Court is respectfully directed to terminate Dkt. No. 100.

Dated: March 26, 2026
        New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge

20